IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2026 Term

FILED

March 12, 2026

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

_____

No. 23-478
_____


STATE OF WEST VIRGINIA,
Plaintiff below, Respondent,

v.

VICTOR LEE THOMPSON,
Defendant below, Petitioner.

_____

Appeal from the Circuit Court of Wood County
The Honorable Jason A. Wharton, Judge
Criminal Action No. 22-F-80

AFFIRMED
_____

Submitted: January 27, 2026
Filed: March 12, 2026


Robert J. Williamson, Esq.
William R. Morris, Esq.
J. Morgan Leach, Esq.
J. Morgan Leach, PLLC
Vienna, West Virginia
Counsel for the Petitioner

John B. McCuskey, Esq.
Attorney General
Lara K. Bissett, Esq.
Assistant Attorney General
Frankie Dame, Esq.
Assistant Solicitor General
Office of the Attorney General
Charleston, West Virginia
Counsel for the Respondent


JUSTICE TRUMP delivered the Opinion of the Court.

# SYLLABUS OF THE COURT

1.      "As to the balancing under Rule 403 [of the West Virginia Rules of Evidence], the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse." Syllabus Point 10, in part, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994).

2.      "Pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness." Syllabus Point 6, *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006), *modified on other grounds by State v. Jako*, 245 W. Va. 625, 862 S.E.2d 474 (2021).

3.      "Where the issue on an appeal from the circuit court is clearly a question of law . . . we apply a *de novo* standard of review." Syllabus Point 1, in part, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

4.     "In order to qualify as an excited utterance under W. Va. R. Evid. 803(2): (1) the declarant must have experienced a startling event or condition; (2) the declarant must have reacted while under the stress or excitement of that event and not from reflection and fabrication; and (3) the statement must relate to the startling event or condition." Syllabus Point 7, *State v. Sutphin*, 195 W. Va. 551, 466 S.E.2d 402 (1995).

5.     This Court applies a de novo standard of review to a circuit court's denial of a motion for judgment of acquittal.

6.     "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." Syllabus Point 3, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

7.	"'[T]he elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one or more of the enumerated felonies [in West Virginia Code § 61-2-1]; (2) the defendant's participation in such commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt.' *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251, 267 (1983)." Syllabus Point 5, *State v. Mayle*, 178 W. Va. 26, 357 S.E.2d 219 (1987).

**TRUMP, Justice:**

On October 6, 2022, a petit jury in Wood County, West Virginia, convicted the Petitioner, Victor Lee Thompson, of the felony murder of Darren Salaam Sr. The jury did not recommend mercy. On July 14, 2023, the Circuit Court of Wood County entered an amended order sentencing the Petitioner to a term of incarceration for life without the possibility of parole. The Petitioner now appeals, claiming evidentiary and constitutional errors. After considering the parties' briefs and the appendix record, hearing oral argument, and reviewing the pertinent legal authorities, we affirm.

## I. Facts and Procedural Background[1]

---

[1]"Because this appeal follows conviction[] after a jury trial, the following factual recitation is drawn from the evidence adduced at trial, presented in the light most favorable to the Government." *United States v. Gershman*, 31 F.4th 80, 87 n.1 (2d Cir. 2022); *see, e.g.*, Syl. Pt. 3, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995) ("An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution."). In so doing, we disregard any evidence unfavorable to the State's case. *See Graham v. Wallace*, 208 W. Va. 139, 141, 538 S.E.2d 730, 732 (2000) (per curiam) (citing Syl. Pt. 3, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995) ("On appeal of a plaintiff's verdict, we are required to assume that a (properly instructed) jury credited the evidence that was favorable to the plaintiff's case and discredited the evidence that was unfavorable to that case.").

On the night of May 29, 2021, Josh and Tiffany[2] McCune (a married couple) drove from Parkersburg, West Virginia, to Akron, Ohio, to pick up their drug supplier Darren Salaam Sr. and his son, Darren Salaam Jr. The group arrived back in Parkersburg at the McCunes' house very early the next morning (May 30). The Petitioner, who was a friend of the McCunes, arrived at their house around the same time. He purchased from Tiffany some of the drugs that Mr. Salaam had supplied to them. After the purchase, the Petitioner departed, as did the McCunes, who went to the home of Tiffany's cousin, Rhonda Bay.

Several hours after purchasing the drugs from the McCunes, the Petitioner and Mr. McCune spoke on the telephone and exchanged several text messages arguing about the lack of quality of the drugs the Petitioner had purchased from Tiffany. Shortly after the McCunes left Rhonda Bay's residence, the Petitioner and his girlfriend, Kiersten, arrived at Rhonda's house where Rhonda provided them heroin or fentanyl.

Sometime later, Rhonda and the Petitioner decided to drive to the McCune home—Rhonda to collect some money that Tiffany owed her, and the Petitioner to secure more drugs because of the bad drugs he had received from Tiffany earlier in the morning. Rhonda Bay entered the McCunes' house alone and talked to Tiffany (who was in a drug-induced stupor) about obtaining her money. Rhonda also told Tiffany that the Petitioner

---

[2]Tiffany died prior to the Petitioner's trial.

wanted drugs. Tiffany did not provide any money to Rhonda Bay or any drugs for the Petitioner. Rhonda went back to the vehicle and told the Petitioner that "Tiffany was out of it and she would get a hold of us later." Several minutes later, Rhonda and the Petitioner picked up Kiersten. Kiersten was angry with the Petitioner because he had not obtained new drugs from Tiffany. Kiersten called the Petitioner a "bitch" and "punk" for not collecting on his "debt."

The Petitioner returned to the McCunes' house, whose porch was then occupied by Colton Davis and Kelsea Province. The Petitioner ripped open the front door of the McCune house. Ms. Province testified that the Petitioner was angry and when she asked him "[w]hat is your problem?" the Petitioner replied by asking "what is your f-ing problem[?]" Darren Jr. testified that he heard the Petitioner enter the McCune house "screaming, yelling." Josh McCune testified that Tiffany told him that the Petitioner accosted her, asking her if she thought he was a "bitch." The Petitioner then struck Tiffany with a pistol and Tiffany "started crying loud." When Mr. Salaam heard Tiffany scream, he took a curtain rod and walked out of the bedroom where he had been staying in the McCune house. Mr. Salaam met Kelsea as she was entering the McCunes' kitchen. She told him to get Darren Jr. and leave the house. Kelsea went back outside. A few seconds later, Colton, Kelsea, and Darren Jr. heard a gunshot. The time from the Petitioner's use of the term "bitch" to the gunshot was about thirty seconds. The Petitioner fled the McCune house and got into the vehicle in which he had come. One of the McCune neighbors

3

observed the Petitioner put something in his pocket before the Petitioner drove away at a "high rate of speed."

Colton and Kelsea entered the McCune house. Mr. Salaam had been shot in the back and was bleeding, a fact confirmed by Darren Jr. in his 9-1-1 telephone call. Mr. Salaam was saying "I didn't do nothing." Mr. Salaam jumped out of a bathroom window and crawled to a neighboring residence. Tiffany McCune emerged from her house moments later, "freaking out" and "panicking" and displaying an injury above her eye.

Parkersburg Police Officer Anthony Deskins was the first police officer to respond to the shooting. The 9-1-1 call was made by Darren Jr. at 2:18 p.m. and Officer Deskins arrived on scene at 2:23 p.m. Officer Deskins testified that he observed Tiffany McCune and that she, like others at the scene, was "frantic" and "emotional." Tiffany approached him and, without any questioning from Officer Deskins, volunteered that the Petitioner had struck her with a pistol and had shot Mr. Salaam. Mr. Salaam later died from his gunshot wound.

The authorities arrested the Petitioner on June 6, 2021. He told the arresting officers that "[u]s white guys have to stick together" and "[a]ll this over a ni*ger[.]"[3] Photographs of the Petitioner were taken by the Parkersburg Police at the Petitioner's

_____

[3]The victim Darren Salaam Sr. was black.

4

booking after his arrest. The booking photographs showed the Petitioner's swastika and Aryan Brotherhood tattoos. At trial, these photographs were displayed to the jury over the Petitioner's objection.

During the booking process the Petitioner stated, "You guys already know it all. I'm going down for manslaughter." During his testimony at trial, the Petitioner admitted both to striking Tiffany McCune in the head and to shooting Mr. Salaam. He claimed that he struck Tiffany because she had access to a gun and was going to use it on him. The Petitioner also claimed that Mr. Salaam was armed when he shot him. No witness other than the Petitioner testified to the presence of such firearms and none were recovered from the scene.

The jury was instructed on premeditated murder as well as the Petitioner's self-defense claim. The jury was also instructed on felony murder, with burglary as the underlying felony. The jury convicted the Petitioner of felony murder. The Petitioner was sentenced to life without mercy.

## II.     Standard of Review

The Petitioner's claims of evidentiary error are reviewed for abuse of discretion. *See, e.g.*, *State v. Lewis*, 235 W. Va. 694, 700, 776 S.E.2d 591, 597 (2015) ("Evidentiary errors are reviewed under an abuse of discretion standard."). The Petitioner's

5

claims of constitutional error are reviewed de novo. *See, e.g., State ex rel. Corbin v. Haines*, 218 W. Va. 315, 320, 624 S.E.2d 752, 757 (2005) ("To the extent Appellant raises constitutional questions, our standard of review is de novo[.]"). We more thoroughly discuss each of the appropriate standards in conjunction with our analysis of the individual issues below.

## III. Discussion

### A. The booking photographs of the Petitioner's tattoos.

The Petitioner objected to the booking photographs showing his swastika and Aryan Brotherhood tattoos, arguing they were not relevant and that their admission was "prejudicial to [his defense]." The State responded that the booking photographs of the tattoos were relevant because they provided the Petitioner's motive in shooting Mr. Salaam: that the Petitioner was a racist and shot Mr. Salaam because Mr. Salaam was black. The circuit court ruled, "the probative value is not substantially outweighed by the prejudicial value [sic] and [that it] would permit [the photographs into evidence]." The Petitioner appeals arguing that the circuit court erred.[4] We disagree with the Petitioner.

---

[4]On appeal the Petitioner also alleges admission of the tattoo evidence violated Rule 404 of the West Virginia Rules of Evidence. However, the Petitioner's Rule 404 argument was not preserved at trial. Rather, the record reveals that the Petitioner objected to this evidence only under Rules 401 and Rule 403. Once the Petitioner made only these Rule 401 and Rule 403 objections at trial, he waived any reliance on Rule 404 on appeal. *See State v. DeGraw*, 196 W. Va. 261, 272, 470 S.E.2d 215, 226 (1996) (holding that a specific objection on one ground waives objections on other grounds).

*1. The tattoo evidence was relevant under Rule of Evidence 401.*

Relevance is governed by West Virginia Rule of Evidence 401 which provides:

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

"[A] circuit court has considerable latitude under the West Virginia Rules of Evidence in determining whether to admit evidence as relevant under Rule[] 401 . . . and decisions concerning relevancy are reviewed under an abuse of discretion standard." *Craddock v. Watson*, 197 W. Va. 62, 66, 475 S.E.2d 62, 66 (1996) (per curiam). "An appellate court should find an abuse of discretion only when the trial court has acted arbitrarily or irrationally." *State v. Beard*, 194 W. Va. 740, 748, 461 S.E.2d 486, 494 (1995). The circuit court did not act in such a manner in this case.

"Under Rule 401, evidence having *any* probative value whatsoever can satisfy the relevancy definition. Obviously, this is a liberal standard favoring a broad policy of admissibility." *McDougal v. McCammon*, 193 W. Va. 229, 236, 455 S.E.2d 788, 795 (1995) (emphasis in original). Because the State had the burden to prove the Petitioner's actions were not in self-defense, evidence of the Petitioner's tattoos was relevant to

establish that the Petitioner's actions were the result of racial animus rather than self-defense:

> In this case, the question of identity is not at issue: all parties agreed that Appellant and [co-defendant] were the actors involved in Victim's death. Therefore, the establishment of guilt hinged upon the motive of Appellant's actions—self-defense or unjustified actions to cause the death of Victim. Establishing a racial motive in this case was significant for the State because the State had the burden to prove Appellant's actions were not in self-defense, but rather constituted an unjustified effort to harm Victim.

*State v. Rosenbaum*, 882 S.E.2d 180, 188 (S.C. Ct. App. 2022) (emphasis deleted). The circuit court did not abuse its discretion in finding the tattoo evidence relevant as it, like the Petitioner's statements upon his arrest, tended to show the Petitioner had some racial animus,[5] which supplied a motive for the Petitioner's actions in killing Darren Salaam Sr., by shooting him in the back, rebutting the Petitioner's claim of self-defense. *See People v. Gaines*, No. B188192, 2006 WL 3072292, at *4 (Cal. Ct. App. Oct. 31, 2006) ("The trial court did not abuse its discretion by admitting evidence of Gaines's swastika tattoo. Evidence that Gaines harbored racial animus against Black persons was relevant to

---

[5]"The swastika is a symbol historically associated with Nazism, Hitler and neo-nazis organizations, as well as with oppression and genocide directed toward racial, religious and ethnic minority groups . . . in western cultures the primary significance of the swastika is its association with white supremacy." *Hoeft v. Lewallen*, No. 09-CV-121-WMC, 2010 WL 1687871, at *1 (W.D. Wis. Apr. 23, 2010). "A reasonable jury, relying on common knowledge, could certainly infer that a person who adorns himself with a swastika tattoo shares the views of Nazi or neo-Nazi groups, and harbors racial animus against nonwhites." *People v. Gaines*, No. B188192, 2006 WL 3072292, at *4 (Cal. Ct. App. Oct. 31, 2006). The same can be said of ornamenting oneself with an Aryan Brotherhood tattoo as the Aryan Brotherhood is a white supremacist prison gang. *Skaff v. W. Va. Hum. Rts. Comm'n*, 191 W. Va. 161, 162, 444 S.E.2d 39, 40 (1994).

8

demonstrate his motives for his actions, and to rebut evidence that he acted only in self defense. Certainly, the racist terms allegedly used by both Hilson and Gaines were sufficient to inject racism in issue as a potential motive for the parties' actions.").

*2. There was no unfair prejudice under Rule of Evidence 403.*

We now turn to the Petitioner's claim the tattoo evidence was inadmissible under Rule 403 of the West Virginia Rules of Evidence as being unfairly prejudicial. Again, we disagree with the Petitioner.

West Virginia Rule of Evidence 403 provides, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

The Petitioner contended at trial that the booking photographs of the tattoos were "prejudicial" to him. However, Rule 403 does not protect against all prejudice—it only protects against "unfair prejudice." "Under Rule 403, '[u]nfair prejudice does not mean damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest [a] decision on an improper basis[,]'" *State v. Donley*, 216 W. Va. 368, 377, 607 S.E.2d 474, 483 (2004) (quoting *State v. LaRock*, 196 W.Va. 294, 312, 470 S.E.2d 613, 631 (1996)), "'commonly, though not

9

necessarily, an emotional one.'" *State v. Sites*, 241 W. Va. 430, 441, 825 S.E.2d 758, 769 (2019) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (internal quotation marks and citation omitted)). Furthermore, Rule 403 uses the phrase "substantially outweighed." "By the choice of the term 'substantially outweighed,' there was adopted a basic policy favoring admissibility of relevant evidence." *United States v. Hearst*, 563 F.2d 1331, 1348-49 (9th Cir. 1977). "To be clear, Rule 403 creates a presumption of admissibility." 1 Louis J. Palmer, Jr. *Handbook on Evidence for West Virginia Lawyers* § 403.03 at 300 (7th ed. 2021).

"As to the balancing under Rule 403 [of the West Virginia Rules of Evidence], the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse." Syl. Pt. 10, in part, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994). Because trial judges are much closer to the pulse of a trial than appellate judges can ever be, "'if judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal.'" *State v. Taylor*, 215 W. Va. 74, 86-87, 593 S.E.2d 645, 657-58 (2004) (Davis, J., dissenting) (quoting 2 *Weinstein's Federal Evidence* § 403.02[2] [d] at 403-22 (2d ed. 2003) (footnote omitted)). "A reviewing court should defer to the ruling of the trial court on a Rule 403 issue, unless the ruling is an arbitrary or irrational exercise of discretion." 1 Palmer, *Handbook on Evidence for West Virginia Lawyers* § 403.04[5] at 307-08 (footnote omitted). "Only rarely, in extraordinary circumstances, will we from a vista of a cold appellate record reverse a trial court's on-the-

10

spot judgment concerning the relative weighing of probative value and unfair effect." *State v. Potter*, 197 W. Va. 734, 751, 478 S.E.2d 742, 759 (1996). Such extraordinary circumstances are not present in this case.

Admittedly, the Petitioner's swastika and Aryan Brotherhood tattoos are odious, but in this case, they are relevant to a determination of the Petitioner's motive—which was significant to the State's case. *See, e.g.*, *People v. Corella*, 721 N.Y.S.2d 550, 551 (App. Div. 2001) ("Since the defendant claimed that he acted in self-defense, the issue of his motive was significant."). It has been observed that "[t]he general policy of the . . . Rules [of Evidence] . . . is that all relevant material should be laid before the jury as it engages in the truth-finding process." *Mullen v. Princess Anne Vol. Fire Co.*, 853 F.2d 1130, 1135 (4th Cir. 1988). Consequently, "in reviewing a decision under Rule 403, the court must 'look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.'" *Id*. (quoting *Koloda v. General Motors Parts Div.*, 716 F.2d 373, 377 (6th Cir. 1983)). Thus, "courts are obligated to use the power conferred by Rule 403 sparingly, and to remember that the . . . Rules [of Evidence] favor placing even the nastier side of human nature before the jury if to do so would aid its search for truth." *Id*. The circuit court was within its broad discretion in determining the probative value of the tattoo evidence was not substantially outweighed by the risk of unfair prejudice.

11

## B. Darren Jr.'s 9-1-1 telephone call

At trial, the State sought to introduce the recorded 9-1-1 call that Darren Jr. made on the day his father was killed. The Petitioner objected that the 9-1-1 call was not relevant. The circuit court overruled the objection. On appeal, the Petitioner challenges the circuit court's relevancy ruling claiming the 9-1-1 tape was not relevant.[6] We disagree.

As observed above, Rule 401 of the Rules of Evidence sets a low threshold for relevance. The 9-1-1 recording, at the very least, helped establish that Mr. Salaam had been shot and was bleeding, where the parties were, and what time it was—clearly facts of consequence to the State's murder case against the Petitioner. Thus, the circuit court did not abuse its broad discretion in admitting the 9-1-1 recording as relevant.

## C. Tiffany McCune's statements

---

[6]On appeal the Petitioner also asserts the 9-1-1 call violated Rules of Evidence 403, 801, and 802. The Petitioner's failure to object on these grounds at trial when the evidence was offered waives them on appeal. *See DeGraw*, 196 W. Va. at 272, 470 S.E.2d at 226. The Petitioner argues that he included a Rule 403 objection in his post-trial motions, but this does not aid him as our rules require a contemporaneous objection to preserve an argument for appeal. *See State ex rel. Cooper v. Caperton*, 196 W. Va. 208, 216, 470 S.E.2d 162, 170 (1996) ("It must be emphasized that the contours for appeal are shaped at the circuit court level by setting forth with particularity and at the appropriate time the legal ground upon which the parties intend to rely.").

12

At trial, the Petitioner objected on both Confrontation Clause and hearsay grounds to Officer Deskins' testimony that Tiffany stated to him that the Petitioner had "hit her with a pistol" and that "Vic Thompson had shot Darren Salaam." The circuit court properly overruled both objections.

### 1.    *The Confrontation Clause did not bar Tiffany's statements.*

In Syllabus Point 6 of *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006), *modified on other grounds by State v. Jako*, 245 W. Va. 625, 862 S.E.2d 474 (2021), this Court held:

> Pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* bars the admission of a testimonial statement by a witness who does not appear at trial,[7] unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness.

In a *Crawford* challenge, we must initially determine whether the challenged evidence is testimonial. "Whether a statement is testimonial for Confrontation Clause purposes is a question of law." 23 C.J.S. *Criminal Procedure and Rights of Accused* § 913 at 247 (2016). Consequently, we give this question plenary review because "[w]here the issue on an appeal from the circuit court is clearly a question of law . . . we apply a *de novo*

---

[7]As noted above, Tiffany McCune did not testify at trial as she had died before trial commenced.

standard of review." Syl. Pt. 1, in part, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995). Tiffany McCune's statements to Officer Deskins were not testimonial.

"To determine if a statement is testimonial, we must decide whether it has 'a primary purpose of creating an out-of-court substitute for trial testimony.'" *Bullcoming v. New Mexico*, 564 U.S. 647, 669 (2011) (Sotomayor, J., concurring in part) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). "If a statement's primary purpose is 'not to create a record for trial,' then the Confrontation Clause does not apply." *United States v. Reed*, 780 F.3d 260, 269 (4th Cir. 2015) (quoting *Bryant*, 562 U.S. at 358). Whether a statement is testimonial under the Confrontation Clause is determined by an objective totality of the circumstances test. "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, 576 U.S. 237, 245 (2015) (quoting *Bryant*, 562 U.S. at 358).

An objective examination of the facts in the present case weighs against any finding that Tiffany's statements to Officer Deskins were testimonial; clearly, Tiffany's statements were not primarily meant to preserve testimony for trial but were meant to obtain assistance from law enforcement during an ongoing emergency. Officer Deskins arrived at the scene very quickly, just five minutes after the 9-1-1 call was made.

14

First, Tiffany McCune initiated contact with Officer Deskins when he arrived at the scene, not vice versa. *See, e.g., Wilson v. State*, 151 S.W.3d 694, 698 (Tex. Ct. App. 2004) (footnote omitted) (finding declarant's statements were nontestimonial because, *inter alia*, the declarant "initiated the interaction with the officers; the police did not seek out [the declarant].").

Second, there was no police interrogation. Tiffany McCune volunteered her statements to Officer Deskins without Officer Deskins asking her any questions. *See, e.g., State v. Yeban*, 246 N.E.3d 1150, 1162–63 (Ohio Ct. App. 2024) (observing that "the statements were not made in response to police questioning, one of the hallmarks that distinguishes a testimonial statement"); *but see Mechling,* 219 W. Va. at 376, 633 S.E.2d at 321 ("[T]he existence or lack of government interrogation does not necessarily determine whether a statement is testimonial.").

Third, Tiffany McCune volunteered her statements in an informal environment—she was not in a police station, but at a crime scene, her home. *See Bryant*, 562 U.S. at 377 (distinguishing the informality of police questioning at a crime scene from the formality of a station-house interview found to be testimonial in *Crawford*).

Fourth, there was an ongoing emergency—a shooting where the victim remained suffering at the scene, the perpetrator had fled, was still at large, and posed an ongoing danger to the public. *See, e.g.*, *People v. Brown*, No. 310156, 2013 WL 4487506,

15

at *4 (Mich. Ct. App. Aug. 22, 2013) (citation omitted) ("The threat from the shooter had not ended because neither the reason for shooting nor the shooter's location was known. Thus, the objective circumstances indicate that the primary purpose of the interrogation was to enable the police to meet an ongoing emergency.").

And fifth, the circuit court concluded that Tiffany McCune's statements were excited utterances. *See infra* III.C.2. "[I]t is highly unlikely that a declarant's statement can qualify as a 'classic excited utterance' while at the same time reflect as its primary purpose the production of evidence against an accused. In short, excited utterances are more likely to fall with [sic] the orbit of nontestimonial hearsay under the Sixth Amendment." 30 Wright & Miller, *Fed. Prac. & Proc. Evid.* § 6623 (2d ed.) (Sept. 2025 Westlaw update) (footnote omitted).

Consequently, we find that Tiffany's statements were not testimonial.[8]

---

[8]The Petitioner invokes *State v. Kaufman*, 227 W. Va. 537, 711 S.E.2d 607 (2011), arguing that if Tiffany's statements were nontestimonial, then they were only admissible if they carried an adequate indicium of reliability. But "[r]eliability can usually be inferred where the evidence falls within a firmly rooted hearsay exception." Syl. Pt. 5, in part, *State v. James Edward S.*, 184 W. Va. 408, 400 S.E.2d 843 (1990), *overruled in part by State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006), *and holding modified on other grounds by State v. Kennedy*, 205 W. Va. 224, 517 S.E.2d 457 (1999). The circuit court admitted Tiffany's statements as excited utterances under West Virginia Rule of Evidence 803(2). "It is well established that the excited utterance exception is a firmly rooted hearsay exception for purposes of the Confrontation Clause." *Kowalak v. Scutt*, 712 F. Supp. 2d 657, 686-87 n.2 (E.D. Mich. 2010); *see, e.g., Gannon v. State*, 704 A.2d 272, 275 (Del. 1998) (quoting *White v. Illinois*, 502 U.S. 346, 355 n.8 (1992)) ("The hearsay

16

*2. Tiffany's Statements were admissible as excited utterances.*

Having established that Tiffany's statements were not testimonial, we now examine them to determine if they were inadmissible hearsay. We conclude they were not.

The Petitioner claims that Tiffany's statements were hearsay. The Petitioner is correct; they were hearsay. *See* W. Va. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."). However, not all hearsay is inadmissible. *See id.* R. 802 (hearsay inadmissible unless the Rules of Evidence otherwise allow it to be admitted). The circuit court did not abuse its discretion in finding that Tiffany's statements were admissible as excited utterances under West Virginia Rule of Evidence 803(2).

West Virginia Rule of Evidence 803(2) provides, "[t]he following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness . . . [a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."

> In order to qualify as an excited utterance under W. Va. R. Evid. 803(2): (1) the declarant must have experienced a startling event or condition; (2) the declarant must have reacted while under the stress or excitement of that event and not from

exception for spontaneous declarations, or excited utterances, is 'firmly rooted' in Anglo-American jurisprudence.").

17

reflection and fabrication; and (3) the statement must relate to the startling event or condition.

Syl. Pt. 7, *State v. Sutphin*, 195 W. Va. 551, 466 S.E.2d 402 (1995). It is within the circuit court's discretion to determine if the State established these factors. *See State v. Surbaugh*, 230 W. Va. 212, 225, 737 S.E.2d 240, 253 (2012) ("Reviewing the circuit court's findings that the statements were admissible as excited utterances, we find that the circuit court did not abuse its discretion."). Given the evidence presented to the circuit court, it did not abuse its discretion in finding that Tiffany McCune's statements were admissible as excited utterances.

First, Tiffany McCune experienced startling events. "A 'startling event' is one that triggers the declarant's extreme emotional response." 30 Wright & Miller, *Fed. Prac. & Proc. Evid.* § 6623 (2d ed.) (Sept. 2025 Westlaw update) "A shooting generally constitutes a startling event[,]" *People v. McCauley*, 79 N.Y.S.3d 743, 746 (App. Div. 2018), as does a physical assault. *State v. Lemieux*, No. A18-1509, 2019 WL 2415253, at *3 (Minn. Ct. App. June 10, 2019) ("The subject of the call—a physical assault—is a startling event.").

Second, Tiffany McCune reacted while under the stress or excitement of those events without time for reflection or fabrication. Officer Deskins described Tiffany, along with the others at the scene, as "frantic" and "emotional" after having experienced a shooting and a physical assault. The Petitioner discounts this evidence by arguing that

18

because Tiffany had a reputation for untruthfulness, she lacked reliability. This argument misses the point of the excited utterance exception.

"[W]e have consistently recognized that an excited utterance or spontaneous declaration[9] is admissible as an exception to the hearsay rule under the premise that a person stimulated by the excitement of an event and acting under the influence of that event will lack the reflective capacity essential for fabrication." *State v. Farmer*, 185 W. Va. 232, 236, 406 S.E.2d 458, 462 (1991) (per curiam) (footnote added). *See State v. Bibbs*, 112 Wash. App. 1058 (2002) (Table) (text available at 2002 WL 1797666) ("Finally, Bibbs contends the hearsay was unreliable because S.H. had a bad reputation for truthfulness and portions of her testimony were not consistent with other evidence. These points are irrelevant. Once a court determines that a statement was an excited utterance, the statement's reliability is established and the declarant's reputation is simply of no moment.").[10] Whether Tiffany was under the influence of the startling events when she made her statements to Officer Deskins is a decision left to the discretion of the circuit court; our responsibility on appeal is only to determine if the circuit court abused its

---

[9]Excited utterances and spontaneous declarations are synonymous. *See* Syl. Pt. 1, in part,  *State v. Smith*, 178 W. Va. 104, 106, 358 S.E.2d 188, 190 (1987) ("Rule 803(2) of the West Virginia Rules of Evidence correctly contains the heart of the hearsay exception that was formerly called a spontaneous declaration and which is now termed the excited utterance exception to the hearsay rule.").

[10]In the case before us now, the circuit court permitted the Petitioner to adduce testimony in front of the jury indicating that Tiffany McCune did not have a reputation for truthfulness.

19

discretion in reaching its conclusion. *See, e.g., 2 McCormick on Evid.* § 272 at 428-29 (9th ed. 2025) ("Because of the wide variety of factual situations, appellate courts have recognized substantial discretion in trial courts to determine whether a declarant was still under the influence of an exciting event at the time of an offered statement.").[11] We conclude that the circuit court did not abuse its broad discretion in this case.[12]

---

[11]The Petitioner's reply brief asserts that "since Tiffany had approximately a half hour between the startling event and the time she made her statement, the statement was not made without reflection and fabrication." The Petitioner does not support this factual assertion of a thirty-minute gap with citation to the record, which is itself fatal to his assertion. *See generally* 4 C.J.S. *Appeal and Error* § 727 (2019). But, even if true, a period of thirty minutes does not necessarily take Tiffany's statements out of the realm of excited utterances. The critical question in determining excited utterance is not the passage of time between the event and the statement, but whether the declarant was still under the influence of the startling event when making the statement. While the time between the event and the utterance is a relevant consideration in this regard, "courts have recognized there is no bright-line test for how much time can pass before a statement can no longer be considered an excited utterance." *Strong v. State*, 947 So. 2d 552, 554 (Fla. Dist. Ct. App. 2006); *see, e.g.*, *State v. McLaughlin*, 642 A.2d 173, 175 (Me. 1994) ("There is no bright-line time limit for the requisite state of excitement."). Here, even if thirty minutes had passed, Officer Deskins testified that Tiffany was still "frantic" and "emotional" when she volunteered her statements to him. *See, e.g.*, *United States v. Phelps*, 168 F.3d 1048, 1055 (8th Cir. 1999) (no abuse of discretion in admitting statement as excited utterance where time lapse was fifteen to thirty minutes between event and statement and the declarant was "visibly distraught" when speaking to police officer and statements were not made in response to suggestive questioning); *United States v. Chandler*, 39 M.J. 119, 123 (C.M.A.1994) (victim's statement made thirty minutes after startling event was admissible as an excited utterance because victim was still in a state of nervous excitement as a result of the event); *State v. Anaya*, 799 P.2d 876, 880 (Ariz. Ct. App. 1990) (statement made thirty minutes after startling event was excited utterance where declarant was "crying [and] very hysterical").

[12]The Petitioner also claims that Tiffany was high on drugs when she gave her statements to Officer Deskins and that this negated a finding of excited utterance. The Petitioner has not cited any authority, nor have we found any, supporting such a

Third, Tiffany's statements related to the startling events as they described what the startling events were and identified who the perpetrator was. *See Surbaugh,* 230 W. Va. at 225, 737 S.E.2d at 253 (recognizing that a declarant's identification of the person who initiated the startling event relates to the startling event).

Accordingly, the circuit court did not abuse its discretion in finding that Tiffany's statements were admissible as excited utterances.

## D. Motion for Judgment of Acquittal and a New Trial

In his post-judgment motions for acquittal and for a new trial, the Petitioner argued that the State failed to show that he committed a burglary, a necessary predicate offense to felony murder in this case. We affirm the circuit court's denial of the Petitioner's motions.[13]

---

proposition. *See Hudson v. State*, 179 S.W.3d 731, 737 (Tex. Ct. App. 2005) ("Appellant does not cite, nor have we found, any authority to support appellant's contention that [declarant's] intoxication would make her statement more likely a product of reason and reflection than a product of an exciting event."). Rather, "an excited-utterance declarant's 'intoxication affects only the weight [given] the[ir] [statement], not its admissibility.'" *Austin v. United States*, 343 A.3d 928, 944 n.8 (D.C. 2025) (citation omitted).

[13]Because the Petitioner's two motions basically both allege insufficient evidence, we review them together.

A motion for judgment of acquittal challenges the sufficiency of the State's evidence against a defendant. *See, e.g.*, *State v. Phillips*, 205 W. Va. 673, 677, 520 S.E.2d 670, 674 (1999); *State v. Houston*, 197 W. Va. 215, 229, 475 S.E.2d 307, 321 (1996). We have identified that "[t]he trial court's disposition of a motion for judgment of acquittal is subject to our *de novo* review[.]" *State v. LaRock*, 196 W. Va. 294, 304, 470 S.E.2d 613, 623 (1996); *see also State v. Spinks*, 239 W. Va. 588, 610, 803 S.E.2d 558, 580 (2017) ("We apply a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence."); *State v. Juntilla*, 227 W.Va. 492, 497, 711 S.E.2d 562, 567 (2011) (per curiam) ("The Court applies a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence."). We now hold, consistent with this authority, that this Court applies a de novo standard of review to a circuit court's denial of a motion for judgment of acquittal.

"We review the circuit court's denial of the motion using the same standard as used by the circuit court, which in turn is identical to the standard employed to measure the sufficiency of evidence supporting a guilty verdict." *State v. Salmons*, No. 21-0424, 2023 WL 7276668, at *2 (W. Va. Nov. 3, 2023) (memorandum decision).

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a

reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

Syl. Pt. 3, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). "This standard is a strict one" and "a jury verdict will not be overturned lightly." *Id*. at 667–68, 461 S.E.2d at 173–74. The granting of a judgment of acquittal (or reversing a conviction for insufficient evidence) is only appropriate when "there is *no* evidence from which the jury could find guilt beyond a reasonable doubt." *State v. Zuccaro*, 239 W. Va. 128, 145, 799 S.E.2d 559, 576 (2017) (emphasis in original).

The jury convicted the Petitioner of felony murder under West Virginia Code § 61-2-1.

"[T]he elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one or more of the enumerated felonies [in West Virginia Code § 61-2-1]; (2) the defendant's participation in such commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt." *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251, 267 (1983).

Syl. Pt. 5, *State v. Mayle*, 178 W. Va. 26, 357 S.E.2d 219 (1987). Burglary is an enumerated felony under West Virginia Code § 61-2-1 and was the felony charged in the felony murder count of the Petitioner's indictment. At the time of Mr. Salaam's death, West Virginia's burglary statute provided, in pertinent part, "[a]ny person who breaks and enters, or enters

23

without breaking, a dwelling house . . . with the intent to commit a violation of the criminal laws of this state is guilty of a felony[.]" W. Va. Code § 61-3-11 (2018). The Petitioner asserts that "his entrance [into the McCune house] was done so lacking any intent to commit a crime; he entered as a mutually welcomed guest with the intent of visiting with friends." We disagree. "It is well settled . . . that such intent [to commit a crime] may be inferred by the jury from the facts and circumstances of the case." Syl. Pt. 3, in part, *State v. Ocheltree*, 170 W. Va. 68, 289 S.E.2d 742 (1982); *see also Gilliam v. State*, 508 N.E.2d 1270, 1271 (Ind. 1987) ("Burglars rarely announce their intentions at the moment of entry, so the intent to commit a given [crime] is one fact which may be inferred from the circumstances.").

In the light most favorable to the State, the evidence in this case showed the Petitioner argued with Josh McCune about the quality of drugs the Petitioner had obtained from Tiffany earlier on the day of Mr. Salaam's death. Kiersten, the Petitioner's girlfriend, was upset that the Petitioner had not obtained new drugs from Tiffany—calling him a "bitch" and "punk" for not collecting on his "debt." This caused the Petitioner to become outraged at Tiffany. When the Petitioner then returned to the McCune home, he was angry, screaming and yelling. The Petitioner ripped open the door to the McCune house to gain entry and accosted Tiffany asking if she thought he was a "bitch." The Petitioner then struck Tiffany with a pistol and she "started crying loud." Based upon this evidence, the jury could have reasonably concluded the Petitioner's entry into the McCune home was to assault Tiffany to demonstrate that he was not a "bitch" upon whom she could pass off bad

24

drugs or to obtain more illegal drugs,[14] itself a crime. *See, e.g.,* W. Va. Code § 60A-4-401. During the altercation between Tiffany and the Petitioner concerning the drugs, Mr. Salaam was shot in the back and eventually died from his wound. Thus, we find that there was sufficient evidence to sustain the jury's felony murder verdict.

## IV. Conclusion

For the foregoing reasons, the July 14, 2023, order of the Circuit Court of Wood County, West Virginia, is affirmed.

Affirmed.

---

[14]In fact, this was exactly the Petitioner's testimony at trial, "Q. You [the Petitioner] went over there the afternoon of March [sic] 30, you went over there with the intent to get more drugs from Tiffany, correct? A. Yes."

25